UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SHEILA R. BELANGER-IVES,

    Plaintiff,

v.                                                                          Case No. 1:11-cv-296
                                                                             Hon. Hugh W. Brenneman, Jr.
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
                                           /

## OPINION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for disability insurance benefits (DIB).

Plaintiff was born on August 13, 1977 (AR 144).[1] Plaintiff alleged a disability onset date of January 3, 2001, when she suffered injuries in a motor vehicle accident (AR 45, 144). She has an associate's degree in business technology and has nearly completed a bachelor's degree in the same discipline (AR 42, 356). Plaintiff had previous employment as a boxer (packer/wrapper) at a factory, secretary, real estate clerk, general office clerk, animal care attendant and realtor (AR 46-47, 348).[2] Plaintiff identified her disabling conditions as "[p]roblems from a car accident, knee problems, constant surgery, fractured pelvis, and depression and arthritis" (AR 347). Due to these conditions, plaintiff cannot stand or sit longer than 10 minutes at a time, has problems moving her

---

[1] Citations to the administrative record will be referenced as (AR "page #").

[2] Plaintiff's real estate license lapsed in 2009 (AR 42).

legs, is in constant pain, and is sometimes "freaked out" by driving (AR 347). The ALJ reviewed plaintiff's claim *de novo* and entered a written decision denying benefits on December 14, 2009 (AR 19-30). This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. § 404.1505; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

## II. ALJ'S DECISION

Plaintiff's claim failed at the fourth step of the evaluation. The ALJ initially found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of January 3, 2001 through the last insured date of March 31, 2004 (AR 21). Second, the ALJ found that through the date last insured, plaintiff had the following severe impairments, "chronic right knee pain, status-post multiple right knee surgeries" (AR 21). At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (AR 24). In this regard, the ALJ reviewed Listing 12.04 (affective disorders) (AR 24). The ALJ decided at the fourth step that through her date last insured, plaintiff had:

> the residual functional capacity to lift and carry up to 30 pounds at waist level, up to 25 pounds at shoulder level, and up to 20 pounds overhead. She was able to push and pull up to 30 pounds using her body weight. She was able to do static standing for up to 10 minutes at a time, do dynamic standing for up to 20 minutes at a time, and walk for up to 10 minutes at a time. She could occasionally sit. She could frequently balance, grasp, pinch, reach forward, and write. She could climb stairs and ladders with support. She had no vision or hearing deficits.

(AR 25). At the fourth step, the ALJ found that through the date last insured, plaintiff was capable of performing her past relevant work as a real estate agent, work which "did not require performance of work-related activities precluded by the claimant's residual functional capacity" (AR 29). Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, from January 3, 2001 (the alleged onset date) through March 31, 2004 (the date last insured) (AR 29-30).

### III. ANALYSIS

Plaintiff has raised two issues on appeal.

**A.   Whether the Commissioner erred as a matter of law in failing to provide valid reasons for rejecting the opinions of Ms. Ive's treating physicians.**

**1.   Plaintiff's claims**

Plaintiff contends that her disabling condition is the direct result of a motor vehicle accident which occurred on January 3, 2001.[3] The ALJ summarized plaintiff's claims as follows:

> She testified that she was not able to work because she was injured in a motor vehicle accident in January 2001 and fractured her right pelvis and lower extremity which required surgery to repair. She injured her right knee in that accident and had additional surgery in August or October 2001. She had a second knee surgery in November 2002. She had physical therapy after that. She started having trouble with her left knee in 2007 and had her first left knee surgery for problems with that joint in March 2007. She also had injections to address pain in her knees. When asked about playing softball in July 2007 and hurting her knee then she did not recall that even though her medical records show that was recorded when she went to see her doctor complaining of knee pain. She did recall a fall in that time frame resulting in an injury to her knee. She has had three left knee surgeries in total. She also took medication that she said gave her a "medicated" feeling, and she complained of being tired all the time. She was also struggling with depression. However, she did not take any medications for depression or anxiety in 2002 and for a period of time after that, and also did not take the medication from 2007 to a couple of months before the hearing.
>
> The claimant conceded that her primary problems in 2004 were related to her right knee and her pelvis. Back in 2004 she required a cane to ambulate and could not walk even a block. She testified that she could lift or carry up to 20 to 25 pounds. With regard to her depression and anxiety the claimant testified that she had counseling right after the accident but then not again until 2007. She also took some medication right after the MVA, but not after 2002 and then again later, but she did not take any medication for pain from 2007 to a couple of month prior to the hearing. She had anxiety attacks a few times a month, had crying spells, did not like to drive, and had trouble interacting with people. She saw Dr. VanderMaas in 2007 and had

---

[3] Plaintiff's brief contains an apparent typographical error, referring to the accident as occurring on January 1, 2003. *See* Plaintiff's Brief at p. 2.

seen Dr. Scholten for about a year prior to the hearing, but not before that. She did not treat with Dr. Guettler until 2008. She has had attendant care since 2007. She slept in a hospital bed at home and used a TENS unit. She speculated that back in 2004 she would have missed 2 days every week she worked secondary to her impairments.

(AR 26-27).

### 2.     Plaintiff's medical history since 2001

The ALJ summarized plaintiff medical history commencing in 2001:

The medical evidence of record shows that the claimant was involved in a roll-over MVA in January 2001 and when she went to the hospital right after that accident, the claimant complained of right ankle, right knee, head and neck pain. X-rays of all of those areas were negative (Exhibit 1F). The claimant has had other diagnostic testing of her right knee including magnetic resonance imaging (MRI) studies of that joint in June 2001, which showed minimal effusion with an otherwise normal joint, and in September 2008 which showed a small joint effusion and a probable osteochondral fracture that was chronic (Exhibit 25F, p. 25). She had injections in her right knee to help relieve her pain in 2005 and later (Exhibit 12F).

Prior to her date last insured, the claimant has had multiple surgeries on her right knee including on November 14,2002 (Exhibit 12F, p. 122). After that surgery her pain was much better (Exhibit 12F, p. 123). As of the middle of 2003 she had undergone two right knee surgeries (Exhibit 12F, pp. 38, 39, 123, 124, 126, 148, 154). As of June 2003 the claimant could do a seated job according to her surgeon Kim Eastman, M.D. (Exhibit 12F, p. 129). A letter authored by Dr. Eastman on October 16, 2007 is quite informative about the claimant's history. There he confirmed that prior to that date the claimant had three right knee surgeries. She did well after those surgeries with regard to her right knee symptoms. However, she required additional injections in that joint to have good pain control. With regard to left knee pain the doctor noted that the claimant complained of some left knee pain in July 2003 and then not again until January 2007. Those complaints led to the March 2007 left knee arthroscopy. That surgery revealed that the claimant had only some "minor" left knee patellar cartilage wear. The remainder of the knee was "pristine." That left knee surgery provided her with good pain relief until she was chasing her child around a tree in August 2007 when her left knee pain returned. The doctor made the point in that letter that it appeared unlikely that the claimant had much of a problem in her left knee prior to 2007. He noted that in order for that to be true, either her doctors would have had to exclude it from her medical records, or she would not have actually complained about left knee pain prior to that date. In addition he pointed out the obvious; that the claimant, on visual inspection when he conducted his arthroscopic surgery in 2007, had only "fairly minor, quite minor"

6

>cartilage wear at that time. That is not consistent with her having a significant left knee problem prior to her date last insured [March 31, 2004] (Exhibit 16F, pp. 1-2).

(AR 27).

### 3. Plaintiff's treating physicians

Plaintiff contends that the ALJ improperly evaluated the opinions of two orthopedic specialists, Joseph Guettler, M.D. and John Healey, Jr., M.D., by affording their opinions "greatly reduced weight" (AR 28-29). Plaintiff's Brief at p. 8. In addition, the ALJ erred by giving significant weight to a letter dated October 16, 2007 from plaintiff's previous orthopedic surgeon (AR 28). *Id.* pp. 8-13.

A treating physician's medical opinions and diagnoses are entitled to great weight in evaluating plaintiff's alleged disability. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations"). The agency regulations provide that if the Commissioner finds that a treating

7

medical source's opinion on the issues of the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." *Walters*, 127 F.3d at 530, *quoting* 20 C.F.R. § 404.1527(d)(2).

An ALJ is not bound by the conclusory statements of doctors, particularly where the statements are unsupported by detailed objective criteria and documentation. *Buxton*, 246 F.3d at 773; *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992). In summary, the opinions of a treating physician "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1526. Finally, the ALJ must articulate good reasons for not crediting the opinion of a treating source. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").

### a. Dr. Guettler

The ALJ gave reduced weight to Dr. Guettler's opinion of May 15, 2009 (AR 28). The ALJ noted that plaintiff had no contact with Dr. Guettler prior to her last insured date, and first saw him in 2008 (AR 27). The doctor's opinion regarding plaintiff's condition on May 15, 2009 was minimally probative (if not irrelevant) to plaintiff's DIB claim, because the opinion reflected plaintiff's condition more than five years after her last insured date. "[I]nsured status is a requirement for an award of disability insurance benefits." *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984). Since plaintiff's insured status for purposes of receiving DIB expired on March 31,

2004, she cannot be found disabled unless he can establish that a disability existed on or before that date. *Id.* "Evidence relating to a later time period is only minimally probative." *Jones v. Commissioner of Social Security*, No. 96–2173, 1997 WL 413641 at *1 (6th Cir. July 17, 1997), citing *Siterlet v. Secretary of Health & Human Services*, 823 F.2d 918, 920 (6th Cir. 1987) (where doctor examined the claimant approximately eight months after the claimant's insured status expired, the doctor's report was only "minimally probative" of the claimant's condition for purposes of a DIB claim). Evidence of a claimant's medical condition after the last insured date is only considered to the extent it illuminates that condition before the expiration of the claimant's insured status. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988). Accordingly, the ALJ could properly give Dr. Guettler's opinion greatly reduced weight (AR 28).

### b. Dr. Healey

The ALJ also gave reduced weight to the opinions expressed by Dr. Healey in his "Physical Capacities Assessment" completed on December 15, 2008 (AR 28). This assessment was completed a few weeks after plaintiff underwent left knee surgery on November 6, 2008 (AR 1202-03). Like Dr. Guettler's 2009 opinion, Dr. Healey's 2008 opinion was prepared years after plaintiff's last insured date and is only minimally probative (if not irrelevant) to plaintiff's DIB claim. *Higgs*, 880 F.2d at 863; *Garner*, 745 F.2d at 390; *Jones*, 1997 WL 413641 at *1. Accordingly, the ALJ could properly give Dr. Healey's 2008 opinion greatly reduced weight (AR 29).

      **c.      The October 16, 2007 letter**

The ALJ evaluated "Dr. Eastman's letter of October 16, 2007" and found the doctor's opinions "particularly as they relate to her left knee pain" were supported by the physical therapy records and other evidence, and gave those opinions significant weight (AR 28, 996-97). However, the ALJ erred in attributing the October 16, 2007 letter to Dr. Eastman. This letter, which discussed Dr. Eastman's evaluation and treatment of plaintiff from 2001 through 2003, was written by Dr. Healey (AR 996-97). The letter primarily addressed plaintiff's complaints about her left knee, with Dr. Healey noting that while plaintiff complained about her left knee once in July 2003, she did not complain about her left knee again until January 22, 2007 (nearly three years after her last insured date) (AR 996). Dr. Healey opined that plaintiff's right knee problems were directly related to the motor vehicle accident, that "it is a bit of a stretch" to connect plaintiff's "new" left knee medial femur cartilage problem to the accident, but that "there is a stronger case" for plaintiff's left knee patellar cartilage wear being related to the accident (AR 997). Although the ALJ incorrectly attributed this letter to Dr. Eastman, the substance of the letter supports the ALJ's decision that there was no objective evidence that plaintiff had a severe left knee impairment prior to her date last insured (AR 27-28).

      **B.      Whether the Commissioner erred as a matter of law in postulating an erroneous RFC by failing to ask any hypothetical questions of the vocational expert (VE) for the time period between January 1, 2003 through 2004.**

Plaintiff contends that the ALJ's hypothetical question was flawed for three reasons. First, the ALJ failed to ask a hypothetical question related to the time period from her alleged onset date (January 3, 2001) "to the time period before [plaintiff's] last insured date" (March 31, 2004). Plaintiff's Brief at pp. 13-14. Second, the ALJ failed to incorporate plaintiff's non-exertional

10

limitations into her RFC and the hypothetical question. *Id.* at pp. 15-18. Third, plaintiff failed to incorporate the exertional limitations consistent with Dr. Healey's opinions (as discussed in plaintiff's first issue) (*see* § I, *supra*.). *Id.* at p.18.

### 1. Legal standard for hypothetical questions posed to a VE

An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779. However, a hypothetical question need only include those limitations which the ALJ accepts as credible. *See Blacha v. Secretary of Health and Human Services.*, 927 F.2d 228, 231 (6th Cir. 1990). Because the purpose of the hypothetical question is to elicit testimony regarding a claimant's ability to perform other substantial gainful activity that exists in the national economy, the question does not need to include a listing of the claimant's medical diagnoses. "[A] hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions." *Webb*, 368 F.3d at 632.

### 1. Plaintiff's condition prior to March 31, 2004

Plaintiff states that at the very least, she is entitled to a closed period of disability from the time of her motor vehicle accident until she recovered from surgery performed in September 2003. Plaintiff's Brief at p. 11. In support of this claim, plaintiff points to a letter from Dr. Healy to an insurance company, in which the doctor stated that plaintiff had surgeries on her

11

right knee in October 2001, November 2002 and September 2003, noting that "[s]he had a lengthy recover for her right knee, particularly having had annual surgery for three years in a row" (AR 590). While plaintiff's orthopedic specialist, Dr. Eastman, released plaintiff for part-time, "seated" work on June 4, 2003, this release for part-time work was about three months prior to her September 2003 surgery (AR 707). From the time of the motor vehicle accident in January 2001 through September 2003, plaintiff underwent a series of surgical procedures, which included surgery to excise a rectovaginal nodule (January 2001) and three reconstructive surgeries on her right knee (October 2001, November 2002 and September 2003). This record of multiple surgeries during this period of less than two and one-half years, coupled with Dr. Eastman's opinion that plaintiff was able to perform only part-time employment in June 2003, supports plaintiff's claim that she was disabled during some or all of this time period. In addition, plaintiff testified about her condition from January 2001 through February 2004, including the need to recover from each surgery and the work restrictions that resulted from each surgery (AR 47-49, 53-56, 59-61, 78-87). The ALJ's hypothetical question did not address this time period. Rather, the ALJ asked the VE to consider plaintiff's condition from the date last insured through the date of the hearing, i.e., "if we assume the claimant's testimony to be true, and of course we have to go back to that date last insured of March, '04, and looking at what the limitations were then and continuing . . ." (AR 87). By phrasing the hypothetical question in this manner, the ALJ excluded plaintiff from seeking a closed period of disability prior to her last insured date of March 31, 2004. Accordingly, this matter will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of whether plaintiff is entitled to a closed period of benefits.

### 2.     Plaintiff's non-exertional limitations

Plaintiff contends that the ALJ failed to include non-exertional limitations identified by an examining psychologist, Richard L. King, Ed.D. and a treating therapist, Virginia Scholten, M.S.W.  Dr. King diagnosed plaintiff with a major depressive disorder (recurrent-moderate), generalized anxiety disorder (moderate with PTSD traits) and a pain disorder associated with both psychological factors and a generalized medical condition (chronic) (AR 1246-54).  Dr. King opined that these conditions resulted in extreme limitations in plaintiff's ability to perform activities of daily living, with marked limitations in her reliability and her ability to maintain concentration, persistence and pace, that she had more than four episodes of decompensation (each of extended duration), and that she had moderate limitations in her social functioning (AR 1247).  The record reflects that plaintiff met with M.S.W. Scholten for therapy sessions in 2009 and 2010 (several years after her last insured date) (1255-66, 1329-34).

Matthew Rushlau, Ed.D., a non-examining psychologist, prepared a Psychiatric Review Technique form (PRTF) on December 18, 2007 (AR 1043-56).  In his PRTF, Dr. Rushlau concluded that there was insufficient evidence to find any non-exertional limitations during the relevant time period of January 3, 2001 through March 31, 2004 (AR 1043-56).  In this regard, Dr. Rushlau noted that plaintiff had only one office visit in which she complained of depression and that no medications were prescribed at that time (AR 1055). The ALJ observed the lack of medical evidence supporting plaintiff's claim of depression:

> The claimant also alleges depression, however, there is no documentation that supports her allegation that any depression she had was severe during that relevant period of time from her alleged onset date through her date last insured, March 31, 2004.  She was seen by her doctor on February 28, 2002 complaining that she had been hit in the chest by a piece of wood while helping her husband gather fire wood.  She also complained at that time that she had some knee pain and was worried about

13

> her weight. As a result of those stressors she was somewhat tearful and her doctor concluded that she had some depression secondary to those problems. However, no counseling was recommended and ho psychotropic medications were provided to the claimant on that visit (Exhibit 12F, p. 154).

(AR 22). In reviewing Dr. King's evaluation from May 15, 2009, the ALJ noted that the evaluation was more than five years after plaintiff's last insured date and that Dr. King did not specifically address that period of time from her alleged onset date to her date last insured (AR 22). Based on this record, the ALJ gave Dr. King's opinions greatly reduced weight and concluded that plaintiff did not have a severe mental impairment at any time prior to her date last insured date (AR 24, 28). ALJ could properly reject Dr. King's opinions as only minimally probative (if not irrelevant) to plaintiff's DIB claim. *Higgs*, 880 F.2d at 863; *Garner*, 745 F.2d at 390; *Jones*, 1997 WL 413641 at *1.

Plaintiff also contends that the ALJ misstated the evidence with respect to plaintiff's non-exertional limitations, when he advised the VE as follows:

> We don't have any assessment form the state agency in the file. I believe they found insufficient evidence to go back to the date last insured, period, both physically and mentally, and I do have several other assessments in the file, starting with the functional capacity evaluation that was done in [July 2008]. . .

(AR 88). The court disagrees. Dr. Rushlau performed an evaluation of plaintiff's records through her date last insured and found no evidence of a mental impairment. "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services.*, 39 F.3d 115, 118 (6th Cir. 1994). Accordingly, the ALJ's hypothetical question posed to the VE could properly omit plaintiff's unsubstantiated claim that she suffered from disabling mental impairments prior to her last insured date.

### 3. Dr. Healey's limitations

As previously discussed, the ALJ found that Dr. Healey's opinions expressed in 2008 were only minimally probative (if not irrelevant) to plaintiff's physical condition prior to her last insured date. *See* discussion in § III.A.3.b., *supra*. The ALJ could exclude this evidence, which did not accurately reflect plaintiff's limitations during the relevant time period from the hypothetical question. *See Webb*, 368 F.3d at 632; *Varley*, 820 F.2d at 779.

## IV. CONCLUSION

The ALJ's decision failed to address whether plaintiff suffered from a closed period of disability. Accordingly, the Commissioner's decision will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings. On remand, the Commissioner should evaluate whether plaintiff suffered from a closed period of disability from her alleged onset date of January 3, 2001 through her last insured date of March 31, 2004. A judgment order consistent with this opinion shall be issued forthwith.

Dated:  September 24, 2012                               /s/ Hugh W. Brenneman, Jr.
                                                         HUGH W. BRENNEMAN, JR.
                                                         United States Magistrate Judge